# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0888-18T4

B.D.,

     Plaintiff-Respondent,

v.

L.N.,

     Defendant-Appellant.

_____

> Argued October 16, 2019 – Decided December 5, 2019
>
> Before Judges Yannotti, Hoffman and Currier.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket Nos. FV-09-2356-18 and FV-09-0127-19.
>
> Kathleen Petrea Garvey argued the cause for appellant (Marotta & Garvey, attorneys; Kathleen Petrea Garvey, on the briefs).
>
> Diana E. Griffin argued the cause for respondent (Northeast New Jersey Legal Services Corp., attorneys; Diana E. Griffin, on the brief).

PER CURIAM

Defendant L.N. appeals from a final restraining order (FRO) entered by the Family Part on September 13, 2018 pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We reverse.

I.

On May 24, 2018, plaintiff filed an application with the court for a temporary restraining order (TRO), alleging that defendant had engaged in acts that constituted harassment under N.J.S.A 2C:33-4. Plaintiff claimed that defendant had threatened him. He alleged that he was "scared for himself and for his child." The court granted plaintiff's application for a TRO. On June 13, 2018, plaintiff amended his complaint, alleging that defendant violated the TRO by engaging in further acts of harassment.

The parties appeared in court on July 5, 2018. Thereafter, as the parties were leaving the courthouse, they engaged in a verbal altercation. Defendant was arrested for violating the TRO. Defendant then filed an application with the court for a TRO. She alleged that plaintiff threatened and harassed her. The court granted defendant's application. Plaintiff then amended his complaint to include allegations related to the July 5, 2018 incident.

On July 16, 2018, the court began the evidentiary hearing on the parties' respective applications for FROs. Plaintiff testified that in 2016, he and

defendant met at work and soon after began what plaintiff said was a "sexual relationship." At the time, plaintiff was in a long-term relationship with another woman, whom he referred to as his wife, and defendant was married to a man who was living in another country. The parties kept their relationship a secret. They would meet at hotels to have sex.

In November 2017, plaintiff was fired after he had an altercation with defendant in the place where they worked. Plaintiff also testified that in December 2017, he and defendant met at a hotel in Jersey City. On his phone, plaintiff had a video of himself and defendant having sex, which they had recorded in August 2017. Plaintiff asserted that defendant had agreed he could make the video, provided he kept it for himself. Plaintiff claimed he never showed anyone the video.

Plaintiff testified that at the hotel in December 2017, defendant took his phone and sent the sex video to her husband. Defendant's husband then called defendant and she passed the phone to plaintiff. Plaintiff told defendant's husband "everything that was going on." According to plaintiff, defendant grabbed plaintiff's phone and smashed it on the ground.

Plaintiff stated that his relationship with defendant ended on May 20, 2018. On that day, plaintiff spoke with defendant on the phone. Previously,

3

A-0888-18T4

plaintiff told his wife about his relationship with defendant. Plaintiff said defendant told him she would get back at him for breaking his promise to keep their relationship secret. He testified that defendant said she and her husband would destroy his child's life. Plaintiff's child was then nine years old.

Plaintiff testified regarding the incident on July 5, 2018. He said he left the courthouse before defendant, and he was waiting outside for a ride. Plaintiff saw defendant and her supervisor, S.F., who was pointing at him and laughing. He asked her if there was a problem.

According to plaintiff, defendant told him to "go watch your son." He said this made him mad and he reported the incident to a sheriff's officer. He denied saying he promised defendant would "pay for this." He also denied threatening to kill defendant. In addition, plaintiff denied sending death threats to defendant.

R.P. testified that she considers herself to be plaintiff's wife, although they are not legally married. She stated that on April 22, 2018, she spoke with defendant on the phone. According to R.P., defendant said she had been going "out" with plaintiff for a long time, and she knew many personal "things" about R.P. She stated that she saw defendant on May 11, 2018, in Jersey City, and tried to speak with her, but defendant "just walked off."

A-0888-18T4

R.P. further testified that defendant sent her a text message on May 20, 2018, but R.P. did not speak with defendant. She claimed that on June 1, 2018, defendant called R.P.'s phone, using a mobile application. R.P. did not answer the call.

R.P. claimed that on June 4, 2018, defendant or defendant's friend sent a text message to her phone, from an unknown number. R.P. presented the court with a "screen shot" of the message, which was sent in Spanish. It was translated into English. The message stated, "If you do not want problems with us, [defendant] needs to talk to your husband."

R.P. also claimed she received phone calls from a blocked number on July 11 and July 12, 2018. She said the calls were made by someone who sounded like defendant. According to R.P., the caller told her to watch her children.

Defendant testified that plaintiff was fired in November 2017 after he "attacked her" at work. She ended her relationship with plaintiff in April 2018. She testified that plaintiff sent her death threats in an April 2018 text message, but she did not produce the message. She acknowledged that she spoke with plaintiff on the phone on May 20, 2018 but denied telling plaintiff that she was going to make the lives of his wife and children miserable. She also denied threatening plaintiff or his wife.

A-0888-18T4

Defendant further testified that after the parties appeared in court on July 5, 2018, plaintiff followed her out of the courthouse and screamed that he was going to kill her and her supervisor. She claimed that she did not speak a word to plaintiff during that incident.

Defendant presented the court with an audio recording in which plaintiff is stating, "I promise, I promise." Defendant said plaintiff was promising he would kill her. Defendant claimed plaintiff sent her death threats, and she received so many calls at work that she had to change the phone number in her department.

The hearing continued on September 13, 2018. Defendant acknowledged on cross-examination that she did not report plaintiff's alleged death threats to the police. She also stated that she did not seek a TRO because she never "wanted to be going through this situation."

An audio tape was played of a phone call made on August 22, 2018, by a person who said he was calling on behalf of defendant and wanted to speak with plaintiff. Defendant denied knowing the person who made the call. She also denied directing the person to make the call. She said many people have the same names as plaintiff and defendant. She also denied asking anyone to call plaintiff or his wife.

A-0888-18T4

S.F. is defendant's supervisor. She testified that plaintiff worked for the company in 2017. Defendant informed her of the TRO that plaintiff had obtained. S.F. stated that plaintiff had been constantly calling the office. According to S.F., plaintiff said he was going to kill defendant and she should tell defendant "to suck [his] dick." In June 2018, S.F. had the phone number in defendant's department changed because plaintiff had been calling and threatening defendant.

She further testified that she met defendant at the courthouse on July 5, 2018. After they left the building, she saw plaintiff. She claimed she did not make faces, point at, or say anything to plaintiff. S.F. stated that she and defendant were walking down the street and, from behind, she heard plaintiff screaming and threatening defendant. S.F. started to record the incident on her phone and plaintiff walked away. According to S.F., defendant was upset by this incident and plaintiff's calls to the workplace.

After the attorneys made their closing arguments, the judge issued an oral opinion. The judge stated that he did not find any of the testifying witnesses credible. The judge addressed defendant's claim that the voicemail was part of a setup by plaintiff and his "wife." The judge commented:

> A valid thing to consider, as [counsel] stated. But the
> problem I have is - - is your testimony. What you said

and how you said it. You listened to [the August 22 voicemail]. You deny it. That's fine. You can deny it, but even I can understand what's being said on that tape, when the male person identified himself as a friend of [defendant]. That's the question that you didn't want to answer - - five [or] six ways . . . . Prior to that, you said something that blows your credibility away. Where you say, well, there's many [persons with the same names as the parties]. That's not what I wanted to hear. If that's me sitting in your chair, and somebody - - and I didn't do any of this - - and had nothing to do with it and being "setup" - - I would say, I have nothing to do with that. I don't know who those people are, and I'd be a little bit upset that the only person who has a reason to do this is [plaintiff]. I wouldn't say, well, there's a lot of [persons with similar names]. Well, the only [B.'s] and [L.'s] who are in my courtroom today are you. So, I don't think it's a coincidence, by [the August 22 voicemail], a twenty-second tape, that mentions [B.] and [L.], I don't think they're talking about somebody else. That's what kills that argument. . . .

The judge found that defendant did not violate the TRO on July 5, 2018, but she did violate the TRO by engaging in acts of harassment after the court entered that order. The judge found that defendant's communications had no purpose other than to alarm and harass plaintiff. The judge also found that defendant had not presented sufficient evidence to support her application for an FRO. The judge noted that defendant did not provide a log evidencing the alleged phone calls to her office or copies of the threatening text messages.

8

The judge explained that he did not think there was a need for an FRO based on plaintiff's testimony, but there was a need for an FRO based on defendant's conduct. The judge stated that he did not fear for plaintiff's son, but that defendant's contacts must cease.

On September 13, 2018, the court entered the FRO against defendant. The court also entered an order dismissing defendant's complaint and vacating the TRO she obtained. Defendant's appeal followed.

## II.

On appeal, defendant argues: (1) the trial court's finding that defendant committed the predicate act of harassment is not supported by the evidence; and (2) the FRO should be reversed because there was no finding that an FRO was necessary to protect plaintiff from immediate harm or to prevent further abuse.

The scope of our review of an FRO in a domestic violence matter is strictly limited. Peterson v. Peterson, 374 N.J. Super. 116, 121 (App. Div. 2005). We are bound by a trial court's findings of fact if they are "supported by adequate, substantial, credible evidence." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). Our deference to the trial court's factual findings "is especially appropriate 'when the evidence is largely testimonial and involves questions of

credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

Because the trial judge heard the case and observed the witnesses, the judge has a "better perspective than a reviewing court in evaluating the veracity of witnesses." Pascale v. Pascale, 113 N.J. 20, 33 (1988) (quoting Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)). Furthermore, an appellate court should accord deference to fact-finding by the Family Part because of its "special jurisdiction and expertise in family matters . . . ." Cesare, 154 N.J. at 413.

It is well established that when considering a domestic violence complaint, the trial court must undertake a two-prong analysis. Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred. See N.J.S.A. 2C:25-29[(a)] (stating that 'the standard for proving the allegations in the complaint shall be by a preponderance of the evidence')." Ibid. The court must consider all evidence in light of the parties' history of domestic violence, if any, and whether there is an immediate danger to person or property. N.J.S.A. 2C:25-29(a)(1) and (2).

If the plaintiff satisfies the first prong, the court then must determine whether to enter a restraining order. Silver, 387 N.J. Super. at 126. The commission of one of the enumerated predicate acts of domestic violence does not require the entry of an FRO. Id. at 126-27 (citing Kamen v. Egan, 322 N.J. Super. 222, 227 (App. Div. 1999)). "[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse. Id. at 127.

### III.

Here, the trial court found that defendant committed predicate acts of domestic violence. The PDVA provides that harassment under N.J.S.A. 2C:33-4 is a predicate act of domestic violence. N.J.S.A. 2C:25-19(13). A person commits the offense of harassment if, with the purpose to harass another, he or she:

> [(a.)] Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> . . . .
>
> [(c.)] Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

11

[N.J.S.A. 2C:33-4.]

To show a violation of N.J.S.A. 2C:33-4 (a), a single communication will suffice. J.D. v. M.D.F., 207 N.J. 458, 477 (2011). The complainant must establish however, that "defendant's purpose in making [the communication], or causing it to be made by another, was to harass and . . . it was made in a manner likely to cause annoyance or alarm to the intended recipient." Ibid.

Moreover, a violation of N.J.S.A. 2C:33-4(c) requires evidence of a course of conduct that consists of repeated acts committed with the intent to "alarm or seriously annoy" the victim. Id. at 478 (quoting N.J.S.A. 2C:33-4(c)). The "serious" annoyance or alarm requirement is satisfied by an intent "to weary, worry, trouble, or offend" the victim. State v. Hoffman, 149 N.J. 564, 581 (1997).

The PDVA further provides that "[c]ontempt of a domestic violence order pursuant to [N.J.S.A. 29-9(b)] that constitutes a crime or disorderly persons offense" is a predicate act of domestic violence. N.J.S.A. 2C:25-19(a)(17). N.J.S.A. 2C:29-9(b) states that "a person is guilty of a crime of the fourth degree if that person purposely or knowingly violates any provision in an order entered under the provisions of the [PDVA]."

A-0888-18T4

Here, the trial judge found that defendant committed predicate acts of harassment by phoning plaintiff on June 1, 2018; causing another person to send plaintiff a text message on June 4, 2018; and having another person call plaintiff on August 22, 2018 and leave a voice mail message. The judge rejected defendant's assertion that the June 1, 2018 phone call was a mistake, and her claim that she had no involvement with the June 4, 2018 text message or August 22, 2018 voice mail.

The judge found that the aforementioned acts had "no other purpose but to alarm and harass." The judge also found that these contacts constituted predicate acts of domestic violence under N.J.S.A. 2C:25-19(a)(17) because they were acts of contempt of the TRO under N.J.S.A. 2C:29-9(b). There is sufficient credible evidence in the record to support these findings.

IV.

On appeal, defendant argues that the judge erred by granting plaintiff's application for an FRO. Defendant contends the record does not support a finding that an FRO was needed to protect plaintiff from immediate harm or protect him from further acts of domestic violence. In response, plaintiff argues that defendant's "brazen disregard" for the TRO shows that an FRO is needed to protect him from further acts of harassment.

 A-0888-18T4

As noted, under <u>Silver</u>, when determining whether an FRO should be issued, the trial court must consider the factors enumerated in N.J.S.A. 2C:25-29(a) and determine whether an FRO is needed "to protect the victim from an immediate danger or to prevent further abuse." <u>Silver</u>, 387 N.J. Super. at 127. Therefore, the court's review shall include the following factors:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a).]

Performing this second inquiry "serves to ensure that the protective purposes of the [PDVA] are served, while limiting the possibility that the [PDVA], or the courts, will become inappropriate weapons in domestic

14

warfare." J.D., 207 N.J. at 488. When a request for an FRO is made, "the court shall grant any relief necessary to prevent further abuse." N.J.S.A. 2C:25-29(b).

Here, the judge stated that based on the testimony presented at the hearing, it did not appear plaintiff was a person who needed a restraining order. The judge noted that on July 5, 2018, after the parties left the courthouse, plaintiff pursued defendant and her supervisor. According to the judge, plaintiff's actions were "stupid" and not the acts of a person in fear.

The judge found that there was no need for an FRO based on plaintiff's testimony. The judge found, however, that an FRO should be entered against defendant because of her conduct, which "has to be stopped." The judge found that he had no fear for the safety of plaintiff's son, but "[t]he contact has to stop."

We are convinced that the trial court's decision to grant the FRO was a mistaken exercise of discretion. We recognize that defendant engaged in acts of harassment by communicating with plaintiff and his wife and that defendant did so after the TRO was entered. However, as the trial court found, any threats communicated by defendant did not place plaintiff in fear, and the judge expressly found that he had no concern for the safety of plaintiff's son.

The record shows that defendant last communicated with plaintiff on August 22, 2018, which was before the hearing continued on September 13,

2018.  The evidence failed to show that plaintiff was in immediate danger of any physical harm or further communications by defendant.  We therefore conclude that plaintiff did not present sufficient evidence to warrant the issuance of an FRO.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0888-18T4